ALAN B. YUTER (SBN 101534)
ayuter@selmanbreitman.com
RACHEL E. HOBBS (SBN 186424)
rhobbs@selmanbreitman.com
SELMAN BREITMAN LLP
11766 Wilshire Boulevard, Sixth Floor
Los Angeles, CA  90025
Telephone:   (310) 445-0800
Facsimile:   (310) 473-2525

Attorneys for
SCOTTSDALE INDEMNITY COMPANY,
individually, and as subrogee to
its insured, NATIONAL PUBLIC
SAFETY SECURITY SERVICES, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| SCOTTSDALE INDEMNITY COMPANY, an Ohio corporation,<br><br>            Plaintiff,<br><br>     v.<br><br>LEXINGTON INSURANCE COMPANY, a Maryland Corporation<br><br>            Defendant. | CASE NO.  ED CV-12-00017 VAP(OPX)<br><br>STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT<br><br>[Filed Concurrently With Scottsdale's Motion for Summary Judgment; Stipulated Facts Re: Cross-Motions for Summary Judgment and Trial; Declaration of Kenneth Harris; Declaration of Alan Yuter; Notice of Lodging of Non-California Authorities; and [Proposed] Judgment]<br><br>Date:       November 26, 2012<br>Time:       2:00 p.m.<br>Dept:       Courtroom 2<br>Judge:      Virginia A. Phillips<br><br>Trial Date       :    1/29/13<br>Discovery Cutoff :    9/28/12 |

    Pursuant to Central District of California Rule 56-1, Plaintiff Scottsdale Indemnity Company, as the moving party in

1  the motion of summary judgment referred to in the attached
2  Notice, submits this 'Statement of Uncontroverted Facts and
3  Conclusions of Law' and proposed judgment.

**UNCONTROVERTED FACTS**

| SUF NO. | FACT | SUPPORTING EVIDENCE |
|---|---|---|
| 1. | National Public Safety ("NPS") is a security company. | Information downloaded from the website of National Public Safety's ("NPS") website ("NPS Website Information"), p. 105, attached as Ex. 5 to Excerpts of the Deposition of Douglas Frost ("Excerpts of Frost Deposition") taken on 9/19/12 in the matter styled *Phillips v. National Public Safety Security Services, Inc.*, Riverside County Case No. RIC 1001521 ("the underlying action"), attached as Ex. 2 to the Declaration of Alan Yuter ("Yuter Declaration"); Excerpts of Frost Deposition, p. 76:15-25 (authentication of NPS Website Information), attached as Ex. 2 to Yuter Declaration; Yuter Declaration, ¶3. |
| 2. | NPS provides escorts for funeral processions. | NPS Website Information, p. 105 attached as Ex. 5 to Excerpts of Frost Deposition, attached as Ex. 2 to Yuter Declaration; Excerpts of Frost Deposition, p. 77:1-4 (funeral escort), attached as Ex. 2 to Yuter Declaration; Yuter Declaration, ¶3. |
| 3. | When NPS officers direct traffic, they essentially perform the functions that a "traffic control cop" does. | Incident Report prepared by the Riverside County Sheriff ("Incident Report"), p. 61:10-13 ("traffic control cop"), attached as Ex. 3 to excerpts of the Deposition of Juan Lopez ("Excerpts of Lopez Deposition") taken on 9/19/12 in the underlying action, attached as Ex. 1 to Yuter Declaration; Excerpts of Lopez Deposition, p. 27:2-28:16 |

Case 5:12-cv-00017-VAP-OP   Document 21   Filed 10/26/12   Page 3 of 18   Page ID #:141

| | | |
|---|---|---|
| | | (authentication of Incident Report), attached as Ex. 1 to Yuter Declaration; Excerpts of Frost Deposition, p. 84:4-8 (officers' duties), attached as Ex. 2 to Yuter Declaration; Yuter Declaration, ¶2 and ¶3. |
| 4. | NPS at times directs funeral processions through red lights. | Excerpts of Deposition of Lopez, pp. 26:2-27:1 (NPS officers trained to enter intersection when traffic stops), attached as Ex. 1 to Yuter Declaration; Excerpts of Frost Deposition, pp. 72:17-73:7 (Lopez did not violate NPS policy in entering intersection on a red light), attached as Ex. 2 to Yuter Declaration; Yuter Declaration, ¶2 and ¶3. |
| 5. | Juan Lopez is, and was on the dates in question, an NPS security officer. | Excerpts of Lopez Deposition pp. 9:17-10:4, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2. |
| 6. | A funeral home known as England Mortuary hired NPS to lead a funeral procession from the funeral home to a cemetery on December 29, 2009. | Excerpts of Frost Deposition, p. 82:16-23 (NPS hired by England Mortuary) attached as Ex. 2 to Yuter Declaration; Excerpts of Lopez Deposition, p. 13:11-18 (route of funeral procession), attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2 and ¶3. |
| 7. | Juan Lopez of NPS was charged with leading the procession on his NPS motorcycle. | Excerpts of Lopez Deposition, pp. 13:5-10 (funeral procession on 12/29/09) and 13:25-14:15 (Lopez was the lead escort), attached as Ex. 1 to Yuter Declaration; Incident Report, p. 61, attached as Ex. 3 to Excerpts of Lopez Deposition, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2. |
| 8. | The funeral procession consisted of more than 30 vehicles. | Incident Report, pp. 62:135-136 (36 vehicles), attached as Ex. 3 to Excerpts of Lopez Deposition, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2. |
| 9. | The motorcycle that Juan Lopez was using to escort | Excerpts of Lopez Deposition, pp. 27:2-28:16 (statement in |

*Selman Breitman LLP — ATTORNEYS AT LAW*

3

535417.1 380.31970

5:12-CV-00017 VAP-OP

| | | |
|---|---|---|
| | the procession was a retired black-and-white police motorcycle. | police report) and 29:5-6 (former police motorcycle), attached as Ex. 1 to the Declaration of Alan Yuter; Incident Report, p. 61, attached as Ex. 3 to Excerpts of Lopez Deposition, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2. |
| 10. | There were other motorcycle officers from NPS helping Lopez to escort the procession. | Excerpts of Lopez Deposition, pp. 13:19-24 (three other security officers), attached as Ex. 1 to Yuter Declaration; Incident Report, p. 61, attached as Ex. 3 to Excerpts of Lopez Deposition, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2. |
| 11. | The NPS motorcycles were black-and-white BMW police motorcycles equipped with air horns and flashing amber lights. | Excerpts of Lopez Deposition, pp. 11:20-24 (air horns), 12:19-22 (strobe lights) and 15:8-12 (black and white BMW), attached as Ex. 1 to Yuter Declaration; Excerpts of Frost Deposition, p. 75:10-21 (Frost's description of NPS motorcycles), attached as Ex. 2 to Yuter Declaration; Incident Report, p. 61, attached as Ex. 3 to Excerpts of Lopez Deposition, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2 and ¶3. |
| 12. | Lopez and the other NPS officers were wearing uniforms consisting of a gold and green helmet, green motor pants, black riding boots, duty belt with an attached radio, and a green shirt with patches, badge and a nameplate. | Excerpts of Lopez Deposition, pp. 15:22-16:4 (description of uniform), attached as Ex. 1 to the Declaration of Alan Yuter; Excerpts of Frost Deposition, p. 75:10-21, attached as Ex. 2 to Yuter Declaration; Incident Report, p. 61, attached as Ex. 3 to Excerpts of Lopez Deposition, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2 and ¶3. |
| 13. | On the date in question, Lopez was in front of the procession, leading it westbound on Sanborn Avenue in Temecula. | Excerpts of Lopez Deposition, pp. 13:5-10 (funeral procession on 12/29/09), 13:25-14:15 (Lopez was lead escort) and 34:1-5 (procession moving westbound on Sanborn), attached as Ex. 1 to Yuter Declaration; Incident Report, |

| | | |
|---|---|---|
| | | pp. 61-62 (information in Sheriff's report), attached as Ex. 3 to Excerpts of Lopez Deposition, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2. |
| 14. | When Lopez reached the intersection of Sanborn and Jefferson, he stopped at the limit line with his motorcycle's lights on and chirped its air horn several times. | Excerpts of Lopez Deposition, p. 17:3-25 (sequence of events), 33:17-20 (air horn chirped several times), attached as Ex. 1 to Yuter Declaration; Incident Report, pp. 61-62 (information in Sheriff's report), attached as Ex. 3 to Excerpts of Lopez Deposition, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2. |
| 15. | In response to Lopez' signals, the opposing traffic traveling on Jefferson stopped. | Excerpts of Lopez Deposition, pp. 17:10-13 and 18:1-4, attached as Ex. 1 to Yuter Declaration; Incident Report, pp. 61-62 (information in Sheriff's report), attached as Ex. 3 to Excerpts of Lopez Deposition, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2. |
| 16. | Lopez wanted to secure the intersection so that the funeral procession could turn southbound on Jefferson. | Excerpts of Lopez Deposition, pp. 11:4-12:12 (procedure for securing the intersection described), 30:4-15 (sequence of events), 32:8-16 ("clear the intersection" explained) and 34:1-5 (direction of traffic), attached as Ex. 1 to Yuter Declaration; CHP Diagram, dated 1/11/10, p. 53, attached as Ex. 2 to Excerpts of Lopez Deposition, attached as Ex. 1 to Yuter Declaration ("Diagram"); Excerpts of Lopez Deposition, pp. 19:9-20:2 (authentication of CHP Diagram), attached as Ex. 2 to Yuter Declaration; Incident Report, pp. 61-62, attached as Ex. 3 to Excerpts of Lopez Deposition, attached as Ex. 1 to Yuter Declaration; Yuter Dec., ¶2. |
| 17. | The traffic on Jefferson that had stopped was | Excerpts of Frost Deposition, pp. 72:7-16 and 73:3-7, |

| | | |
|---|---|---|
| | looking to Lopez for direction. | attached as Ex. 2 to Yuter Declaration; Yuter Declaration, ¶3. |
| 18. | Lopez started slowly riding his motorcycle towards the middle of the intersection. | Excerpts of Lopez Deposition, p. 20:10-21, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2. |
| 19. | The light facing Lopez on Sanborn was red. | Excerpts of Lopez Deposition, p. 19:2-11, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2. |
| 20. | When Lopez proceeded into the intersection, the remainder of the procession was waiting behind the limit line on Sanborn. | Excerpts of Lopez Deposition, pp. 35:24-36:10, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2. |
| 21. | When Lopez reached the middle of the intersection, he got off of his motorcycle and started directing traffic on foot. | Excerpts of Lopez Deposition, pp. 19:12-17 (parked motorcycle in the middle of the intersection), 21:9-12 (dismounted motorcycle) and 25:4-20 (directed traffic), attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2. |
| 22. | Five to ten seconds after Lopez dismounted his bike, he witnessed a collision near the intersection. | Excerpts of Lopez Deposition, pp. 22:14-23:7, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2. |
| 23. | Lopez saw the decedent Ronald Phillips riding his motorcycle northbound on Jefferson. | Excerpts of Lopez Deposition, p. 23:8-12, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2. |
| 24. | The light facing the northbound traffic on Jefferson was green, but all of the traffic on Jefferson had stopped at Lopez' direction. | Excerpts of Lopez Deposition, pp. 20:25-21:20 attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2. |
| 25. | It appeared to Lopez that Phillips tried to slam on his brakes, but could not stop in time and skidded out of control. | Excerpts of Lopez Deposition, p. 23:8-20, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2. |
| 26. | Phillips was ejected from his motorcycle and subsequently collided with the Mitsubishi stopped in front of him, sustaining fatal injuries. | Excerpts of Lopez Deposition, pp. 23:20-24 (Lopez describes collision), attached as Ex. 1 to Yuter Declaration; Incident Report, pp. 60 and 62, attached as Ex. 3 to Excerpts |

| | | |
|---|---|---|
| | | of Lopez Deposition, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2. |
| 27. | There were no NPS vehicles physically involved in the collision. | Excerpts of Lopez Deposition, p. 23:25-24:7, attached as Ex. 1 to Yuter Declaration; Incident Report, p. 60, attached as Ex. 3 to Excerpts of Lopez Deposition, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2. |
| 28. | The police concluded that the accident was attributable to Mr. Phillip's violation of California Vehicle Code §22350, traveling at an unsafe speed for conditions. | Incident Report, pp. 56 and 63, attached as Ex. 3 to Excerpts of Lopez Deposition, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2. |
| 29. | Neither Lopez nor NPS was cited for any traffic violation. | Excerpts of Lopez Deposition, p. 37:8-11, attached as Ex. 1 to Yuter Declaration; Excerpts of Frost Deposition, p. 83:4-7, attached as Ex. 2 to Yuter Declaration; Incident Report, pp. 56 and 63, attached as Ex. 3 to Excerpts of Lopez Deposition, attached as Ex. 1 to Yuter Declaration; Yuter Declaration, ¶2 and ¶3. |
| 30. | NPS did not fault Lopez in connection with the incident. | Excerpts of Lopez Deposition, pp. 37:22-38:1, attached as Ex. 1 to Yuter Declaration; Excerpts of Frost Deposition, pp. 80:23-81:2; Yuter Declaration, ¶2. |
| 31. | On July 30, 2010, the heirs of Phillips brought a suit styled *Phillips v. National Public Safety Security Services, Inc.*, Riverside County Case No. RIC 10015217 ("underlying action") against NPS and Lopez, among others. | Complaint in underlying action, pp. 140-153, attached as Ex. C to Stipulated Facts Re Cross-Motions For Summary Judgment and Trial ("Stipulated Facts"); Stipulated Facts, ¶3. |
| 32. | The initial complaint in the underlying action alleged:<br><br>"**FIRST CAUSE OF ACTION**<br><br>**NEGLIGENCE - WRONGFUL DEATH** | Complaint in the underlying action, pp. 144:13-28, attached as Ex. C to Stipulated Facts; Stipulated Facts, ¶3. |

7

| | | |
|---|---|---|
| | * * *<br>16. On or about December 29, 2009, defendants were negligent in, among other things: the method and manner in which they proceeded with a funeral procession." | |
| 33. | The initial complaint in the underlying action alleged:<br><br>**"SECOND CAUSE OF ACTION**<br><br>**NEGLIGENCE PER SE**<br><br>* * *<br><br>22. Plaintiffs, and each of them, are informed and believe based upon the information alleges that defendants, and each of them, negligently, carelessly, and recklessly;<br><br>a)  Failed to control, operate and drive their vehicle so as to avoid plaintiffs' husband/father colliding with a vehicle resulting in severe and serious injuries resulting in death:<br><br>b)  Defendant, Juan Lopez, while in the course and scope of his employment with defendant, National Public Safety Security Services, Inc. dba National Public Safety and proceeding with a funeral procession run by defendant, England Family Mortuary, Inc. dba England Family Mortuary violated Vehicle Code Section 21453 by proceeding against a red signal:<br><br>c)  Failed to otherwise exercise due care with respect to the matters alleged in this complaint." | |
| 34. | At the time of the incident, NPS's General and | Lexington Insurance Company General and Professional |

| | | |
|---|---|---|
| | Professional Liability Policy No. 33053919 with Lexington Insurance Company was in effect ("Lexington policy"). | Liability Policy No. 33053919 issued to National Public Safety Security Services, Inc., effective from 4/12/09 to 4/12/10 ("Lexington policy"), pp. 84-139, 88, attached as Ex. B to Stipulated Facts; Stipulated Facts, ¶2. |
| 35. | The Lexington Policy provided, in pertinent part:<br><br>"**COMMERCIAL GENERAL LIABILITY DECLARATIONS INCLUDING PROFESSIONAL**<br><br>Policy No.:  33053919<br>Renewal of:  New<br><br>Named Insured and Address: (No., Street, Town or City, County, State)<br>NATIONAL PUBLIC SAFETY SECURITY SERVICES, INC. D/B/A/ NATIONAL PUBLIC SAFETY SECURITY SERVICES, INC.<br><br>Policy Period:  (Mo. Day Yr.) From:  04/12/2009 TO 04/12/2010"<br><br>* * *<br><br>EACH OCCURRENCE LIMIT $1,000,000 | Lexington Policy, pp. 88-89, attached as Ex. B to the Stipulated Facts; Stipulated Facts, ¶2. |
| 36. | The Lexington policy states, in pertinent part:<br><br>"**GUARD SECURE**<br>SECURITY GUARD GENERAL AND PROFESSIONAL LIABILITY INSURANCE<br>OCCURRENCE FORM<br><br>* * *<br><br>**SECTION I. – COVERAGES**<br><br>**COVERAGE A. BODILY INJURY, PROPERTY DAMAGE AND PROFESSIONAL**<br><br>**1.   Insuring Agreement.**<br><br>**a.**   We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily | Lexington Policy, p. 89, attached as Ex. B to the Stipulated Facts; Stipulated Facts, ¶2. |

| | | |
|---|---|---|
| | injury', 'property damage' or 'professional liability' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking damages for 'bodily injury', 'property damage' or 'professional liability' to which this insurance does not apply. We may, at our discretion, investigate any 'occurrence' or 'wrongful act' and settle any claim or 'suit' that may result.<br><br>* * *<br><br>**b.** This insurance applies to 'bodily injury', 'property damage' and 'professional liability' only if:<br><br>* * *<br><br>(2) The 'bodily injury', 'property damage' or 'professional liability' occurs during the policy period." | |
| 37. | The Lexington policy defines an "occurrence" as follows:<br><br>"'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." | Lexington Policy, p. 113, attached as Ex. B to the Stipulated Facts; Stipulated Facts, ¶2. |
| 38. | The Lexington policy defines "bodily injury" as follows:<br><br>"'Bodily injury' means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." | Lexington Policy, p. 110, attached as Ex. B to the Stipulated Facts; Stipulated Facts, ¶2. |
| 39. | The Lexington policy defines "professional liability" as follows:<br><br>"'Professional liability' | Lexington Policy, p. 114, attached as Ex. B to the Stipulated Facts; Stipulated Facts, ¶2. |

10

| | | |
|---|---|---|
| | means liability legally imposed upon an insured arising out of a 'wrongful act'." | |
| 40. | The Lexington policy defines an "wrongful act" as follows:<br><br>"'Wrongful act' means the actual or alleged negligent act, error or omission of an insured arising out of the insider's rendering or failure to render 'Professional Services'. | Lexington Policy, p. 115, attached as Ex. B to the Stipulated Facts; Stipulated Facts, ¶2. |
| 41. | The Lexington policy defines an "professional service" as follows:<br><br>"'Professional services' means the rendering of security guard services pursuant to a written contract. Security guard services shall include but not be limited to watchman, patrol and checkpoint services and related consulting services." | Lexington Policy, p. 114, attached as Ex. B to the Stipulated Facts; Stipulated Facts, ¶2. |
| 42. | The Lexington policy contains, in pertinent part:<br><br>"**2.   Exclusions**.<br>This insurance does not apply to:<br>* * *<br>**g.   Aircraft, Auto or Watercraft**<br>'Bodily injury', 'property damage' or 'professional liability' arising out of the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and 'loading or unloading.'<br><br>This exclusion applies even if the claims against any insured allege negligence | Lexington Policy, pp. 90, 93, attached as Ex. B to the Stipulated Facts; Stipulated Facts, ¶2. |

11

| | | |
|---|---|---|
| | or other wrongdoing in the supervision, hiring, employment, training or monitoring of other by that insured, if the 'occurrence' or 'wrongful act' which caused the 'bodily injury', 'property damage' or 'professional liability' involved the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or watercraft that is owned or operated by or rented or loaned to any insured." | |
| 43. | The Lexington policy defines an "Insured" as follows:<br><br>**"SECTION II – WHO IS AN INSURED**<br><br>* * *<br><br>**2.**   Each of the following is also an insured:<br><br>**a.**   Your 'volunteer workers' only while performing duties related to the conduct of your business, or your 'employees,' other than either your 'executive officers' (if you are an organization other than a partnership, joint venture or limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business." | Lexington Policy, pp. 102-103, attached as Ex. B to Stipulated Facts; Stipulated Facts, ¶2. |
| 44. | On September 28, 2010, NPS tendered the underlying action to Lexington. | Email, dated 9/28/10, from CSS Insurance Agency to Cindy Calise, attaching Acord General Liability Notice of Occurrence/Claim prepared for Lexington regarding complaint in the underlying action, pp. 154-158, attached as Ex. D to the Stipulated Facts; Stipulated Facts, ¶4. |

| | | |
|---|---|---|
| 45. | Lexington did not conduct any investigation aside from reviewing the complaint and its policy. | Stipulated Facts, ¶5. |
| 46. | On October 1, 2010, Lexington denied coverage. | Letter from Kevin Gill of Lexington to Vivian Toma of NPS, pp. 159-161, attached as Ex. E to the Stipulated Facts; Stipulated Facts, ¶5. |
| 47. | At the time of the incident, NPS had a Commercial Auto Policy with Scottsdale Indemnity, Policy No. CAI0043227 ("Scottsdale policy"). | Scottsdale Indemnity Company Commercial Auto Liability Policy No. CAI0043227 issued to "National Public Safety, Inc.," effective from 8/24/09 to 8/24/10 ("Scottsdale policy"), pp. 84-139, attached as Ex. A to the Stipulated Facts; Stipulated Facts, ¶1. |
| 48. | The Scottsdale policy states, in pertinent part:<br><br>"**COMMON POLICY DECLARATIONS**<br><br>**Item 1.  Named Insured and Mailing Address**<br>NATIONAL PUBLIC SAFETY INC.<br>PO BOX 1136<br>LEMON GROVE CA  91946<br><br>* * *<br><br>**Item 2.  Policy Period**<br>From:  08-24-2009<br>To:  08-24-2010<br><br>* * *<br><br>**Business Description**<br>SECURITY PATROL" | Scottsdale policy, p. 4, attached as Ex. A to the Stipulated Facts; Stipulated Facts, ¶1. |
| 49. | The Scottsdale policy states, in pertinent part:<br><br>"**COMMERCIAL AUTO COVERAGE PART BUSINESS AUTO COVERAGE FORM SUPPLEMENTAL DECLARATIONS**<br><br>* * *<br><br>**Coverage**<br>Liability<br><br>**Covered Autos**<br>7<br><br>**Limit**<br>(The Most We Will Pay for Any One Accident or Loss) | Scottsdale policy, p. 7, attached as Ex. A to the Stipulated Facts; Stipulated Facts, ¶1. |

| | | |
|---|---|---|
| | $1,000,000." | |
| 50. | The Scottsdale policy states, in pertinent part:<br><br>**"SECTION II – LIABILITY COVERAGE**<br><br>**A.   Coverage**<br><br>We will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' or use of a covered 'auto'.<br><br>We will also pay all sums an 'insured' legally must pay as a 'covered pollution cost caused by an 'accident' and resulting from the ownership, maintenance or use of covered 'autos'.  However, we will only pay for the 'covered pollution cost or expense' if there is either 'bodily injury' or 'property damage' to which this insurance applies that is caused by the same 'accident'.<br><br>We have the right and duty to defend any 'insured' against a 'suit' asking for such damages or a 'covered pollution cost or expense.' However, we have no duty to defend any 'insured' against a 'suit' asking for such damages or a 'covered pollution cost or expense'. However, we have no duty to defend any 'insured' against a 'suit' seeking damages for 'bodily injury' or 'property damage' or a 'covered pollution cost or expense' to which this insurance does not apply. We may investigate and settle any claim or 'suit' as we consider appropriate. Our duty to defend or | Scottsdale policy, p. 12, attached as Ex. A to the Stipulated Facts; Stipulated Facts, ¶1. |

14

| | | |
|---|---|---|
| | settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlement." | |
| 51. | The Scottsdale policy states, in pertinent part:<br><br>**"SECTION II – LIABILITY COVERAGE**<br><br>**A.   Coverage**<br><br>* * *<br><br>**1.   Who is an Insured**<br><br>The following are 'insureds':<br><br>**a.**   You for any covered 'auto'.<br><br>**b.**   Anyone else while using with your permission a covered 'auto' you own, hire or borrow . . ." | Scottsdale policy, p. 12, attached as Ex. A to the Stipulated Facts; Stipulated Facts, ¶1. |
| 52. | On October 7, 2010, NPS tendered the underlying action to Scottsdale Indemnity Company. | Acord Automobile Loss Notice, dated 10/7/10, prepared by CCS Insurance Agency on behalf of NPS for Scottsdale, pp. 162-163, attached as Ex. F to the Stipulated Facts, Stipulated Facts, ¶6. |
| 53. | On November 16, 2010, Scottsdale advised NPS it was appointing Green & Hall as defense counsel to defend NPS against the underlying action. | Letter, dated 11/16/10, from Kenneth Harris of Scottsdale to Vivian Toma of National Public Safety, pp. 164-165, attached as Ex. G to the Stipulated Facts, Stipulated Facts, ¶7. |
| 54. | On January 6, 2011, the *Phillips* claimants filed a First Amended Complaint ("FAC") alleging that:<br><br>"17. At the time and place of the aforesaid, defendant, JUAN LOPEZ, while in the course and scope of employment for defendant, NPS, controlled, managed, and operated a funeral procession that proceeded against numerous 'red lights' at the intersection of Jefferson | First Amended Complaint ("FAC") filed on 1/6/11 in the underlying action, pp. 166, 169-170, attached as Ex. H to the Stipulated Facts, Stipulated Facts, ¶8. |

| | | |
|---|---|---|
| | Avenue and Sanborn Avenue, in the City of Temecula, County of Riverside, State of California thereby causing traffic which would have otherwise been directed by the numerous 'green lights' at said intersection to continue through said intersection without stopping and/or even slowing thereby breaching his duty of reasonable care owed to Ronald Phillips. | |
| 55. | The FAC states, in pertinent part:<br><br>"18. At the time and place defendants, NPS and JUAN LOPEZ, while in the course and scope of employment for defendant, NPS, negligently, carelessly, recklessly, wantonly, and unlawfully drove, operated, maintained, conducted, controlled a funeral procession so as to directly and proximately cause the collision herein which resulted in Ronald Phillips sustaining severe and serious injuries to his person resulting in his death.  By creating an unreasonably unsafe traffic condition by negligently, carelessly, recklessly and wantonly causing traffic to stop in a busy, thoroughfare, which would otherwise have flowed, without impediment, through the intersection's numerous and plainly visible green lights." | First Amended Complaint ("FAC") filed on 1/6/11 in the underlying action, pp. 166, 170, attached as Ex. H to the Stipulated Facts, Stipulated Facts, ¶8. |
| 56. | The FAC further alleged:<br><br>"32. By entering said intersection against the 'red lights' at Sanborn Ave. and Jefferson, the defendants and each of them created a situation wherein | First Amended Complaint ("FAC") filed on 1/6/11 in the underlying action, pp. 166, 173-174, attached as Ex. H to the Stipulated Facts, Stipulated Facts, ¶8. |

| | | |
|---|---|---|
| | northbound traffic was unlawfully and unreasonably expected to stop based only upon visual clues and or directives which may have been manifested by defendant, JUAN LOPEZ.] The aforementioned visual clues would have directly contradicted all of the other normal traffic flow controls causing vehicles ahead of decedent, Ronald Phillips, to unexpectedly and unreasonably stop.  The deceased, Ronald Phillips, did not receive sufficient warning and/or any other indications that traffic was being directed to stop." | |
| 57. | In August of 2011, Scottsdale settled the underlying action on behalf of NPS and Lopez for $1 million. | Settlement Agreement, dated 8/11, in the underlying action, pp. 3-9, attached as Ex. 1 to the Declaration of Kenneth Harris ("Harris Declaration"); Check no. 4301030 in the amount of $1 million paid by Scottsdale in settlement of the underlying action on behalf of National Public Safety and Juan Lopez, pp. 10-11, attached as Ex. 2 to Harris Declaration; Harris Declaration, ¶2 and ¶3. |
| 58. | On November 15, 2011 and December 20, 2011, Scottsdale requested reimbursement from Lexington on the ground that Lexington covered the underlying loss. | Email, dated 11/15/11, from Ken Harris of Scottsdale to Kevin Gill of Lexington, p. 177, attached as Ex. I to Stipulated Facts; Email, dated 11/30/11, from Kevin Gill to Ken Harris, p. 178, attached as Ex. J to Stipulated Facts; Letter, dated 12/20/11, from Shelly Anderson of Scottsdale to Lexington to Kevin Gill, pp. 179-180, attached as Ex. K to the Stipulated Facts; Stipulated Facts ¶s 9-11. |
| 59. | Scottsdale paid for the defense of NPS and Juan Lopez in the underlying action. | Checks from Scottsdale to Green & Hall in payment of Green & Hall's legal fees in defending NPS and Juan Lopez in the underlying action, pp. |

| | | |
|---|---|---|
| | | 12-55, attached as Ex. 3 to Harris Declaration; Scottsdale's computerized records regarding checks it sent to Green & Hall to pay for its legal fees in defending NPS and Juan Lopez in the underlying action, pp. 56-66, attached as Ex. 4 to Harris Declaration; Harris Declaration, ¶s 4 and 5. |

## CONCLUSIONS OF LAW

1. LEXINGTON INSURANCE COMPANY owed a to defend and indemnify NPS and Juan Lopez for the *Phillips* action under its professional and general liability policy.

2. SCOTTSDALE INDEMNITY COMPANY did not owe a duty to defend or indemnify NPS and Juan Lopez with respect to the *Phillips* action under its commercial auto policy.

3. SCOTTSDALE INDEMNITY COMPANY is entitled to equitable subrogation with respect to the defense and indemnity amounts it incurred on behalf of NPS and Juan Lopez in the *Phillips* action.

4. SCOTTSDALE INDEMNITY COMPANY is entitled to equitable indemnity with respect to the defense and indemnity amounts it incurred on behalf of NPS and Juan Lopez in the *Phillips* action.

5. Judgment should be entered in SCOTTSDALE INDEMNITY COMPANY's favor forthwith.

Dated: October 26, 2012        SELMAN BREITMAN LLP

                               By: */s/RACHEL E. HOBBS*
                                   ALAN B. YUTER
                                   RACHEL E. HOBBS
                               Attorneys for Plaintiff SCOTTSDALE
                               INDEMNITY COMPANY