1

2

3                                                    O

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11  SCOTTSDALE INDEMNITY      )    Case No. EDCV 12-00017 VAP
    COMPANY,                  )    (OPx)
12                           )
                Plaintiff,    )    **ORDER GRANTING PLAINTIFF'S**
13                           )    **MOTION FOR SUMMARY JUDGMENT**
       v.                     )    **IN PART; AND GRANTING**
14                           )    **DEFENDANT'S CROSS-MOTION FOR**
    LEXINGTON INSURANCE       )    **SUMMARY JUDGMENT IN PART**
15  COMPANY,                  )
                             )    **[Motions filed on October**
16              Defendants.   )    **26, 2012]**
    _____ )

17

18      This insurance coverage suit arises out of a third-

19  party automobile accident that occurred while an employee

20  of the insured was providing security services for a

21  funeral procession.  The parties dispute whether the

22  incident falls within the insured's automotive liability

23  policy or general commercial liability policy.  Plaintiff

24  Scottsdale Indemnity Company's ("Scottsdale") Motion for

25  Summary Judgment (Doc. No. 20) and Defendant Lexington

26  Insurance Company's ("Lexington") Motion for Summary

27  Judgment (Doc. No. 24) came before the Court for hearing

28  on November 26, 2012.  After reviewing and considering

all papers filed in support of, and in opposition to, the
Motions, as well as the arguments advanced by counsel at
the hearing, the Court GRANTS Plaintiff's Motion IN PART,
and GRANTS Defendant's Cross-Motion IN PART, as specified
below.

## I.   BACKGROUND

**A.   Procedural History**

Scottsdale filed a Complaint against Lexington on
January 4, 2012, asserting four claims: (1) equitable
subrogation (duty to defend); (2) equitable subrogation
(duty to indemnify); (3) equitable indemnity; and
(4) declaratory relief.  (Compl. (Doc. No. 1).)

Scottsdale filed a Motion for Summary Judgment
("Motion") on October 26, 2012 (Doc. No. 20).  In support
of its Motion, Scottsdale submitted the following
documents:

- Statement of Uncontroverted Facts ("Plaintiff's SUF") (Doc. No. 21)
- Declaration of Kenneth Harris (Doc. No. 22)
- Declaration of Alan B. Yuter (Doc. No. 23)

Lexington filed an Opposition to Scottsdale's Motion
on November 5, 2012 (Doc. No. 32), and Scottsdale filed a
Reply on November 9, 2012 (Doc. No. 35).

1    Lexington also filed a Motion for Summary Judgment
2  ("Cross-Motion") on October 26, 2012.  In support of its
3  Cross-Motion, Lexington submitted the following
4  documents:

5       •    Statement of Uncontroverted Facts ("Defendant's
6            SUF") (Ex. 2 to Cross Motion)
7       •    Declaration of Kevin Gill (Ex. 3 to Cross-
8            Motion)
9       •    Declaration of Michael Claiborne (Ex. 4 to
10           Cross-Motion)

11

12   Scottsdale filed an Opposition to the Cross-Motion on
13 November 5, 2012 (Doc. No. 33); and Lexington filed a
14 Reply on November 9, 2012 (Doc. No. 34).

15

16   In addition, the parties filed a set of Stipulated
17 Facts and attached exhibits applicable to both motions
18 (Doc. No. 27).

19

20 **B.  Underlying Action**
21   The coverage dispute between the two insurance
22 companies here arises out of a fatal traffic accident
23 that occurred in Temecula, California on December 28,
24 2009.  Plaintiff Scottsdale is the commercial automobile
25 liability insurance coverage carrier for National Public
26 Safety ("NPS"); Defendant Lexington is NPS's professional
27 and general liability insurance carrier.  The heirs of
28

Ronald Phillips sued NPS in the California Superior Court
for the County of Riverside, Case No. RIC 1001521 ("the
Phillips suit").  The Phillips plaintiffs alleged that
NPS security guard Juan Lopez acted negligently when he
secured an intersection to allow a funeral procession to
travel through it without interruption, causing a
collision between Phillips and the vehicle in front of
him, driven by another third party.

NPS tendered the Phillips suit to Lexington.
Lexington denied coverage based on the automobile
exclusion contained in the policy.  NPS then tendered to
Scottsdale, its commercial automobile liability carrier,
who agreed to defend NPS and eventually settled the
Phillips action for $1 million.  Scottsdale now brings
this action against Lexington, arguing that Lexington
owed sole coverage for the loss claimed in the Phillips
action, and that Scottsdale thus is entitled to
indemnification for the amount of settlement and the cost
of defense.

## II.   LEGAL STANDARD

A court shall grant a motion for summary judgment
when there is no genuine dispute as to any material fact
and the moving party is entitled to judgment as a matter
of law.  Fed. R. Civ. P. 56(a); Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The moving

1   party must show that "under the governing law, there can
2   be but one reasonable conclusion as to the verdict."
3   Anderson, 477 U.S. at 250.

4

5       Generally, the burden is on the moving party to
6   demonstrate that it is entitled to summary judgment.
7   Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998)
8   (citing Anderson, 477 U.S. at 256-57); Retail Clerks
9   Union Local 648 v. Hub Pharmacy, Inc., 707 F.2d 1030,
10  1033 (9th Cir. 1983).  The moving party bears the initial
11  burden of identifying the elements of the claim or
12  defense and evidence that it believes demonstrates the
13  absence of an issue of material fact.  Celotex Corp. v.
14  Catrett, 477 U.S. 317, 323 (1986).

15

16      Where the moving party has the burden at trial, "that
17  party must support its motion with credible
18  evidence . . . that would entitle it to a directed
19  verdict if not controverted at trial."  Celotex, 477 U.S.
20  at 331.  The burden then shifts to the non-moving party
21  "and requires that party . . . to produce evidentiary
22  materials that demonstrate the existence of a 'genuine
23  issue' for trial."  Id.; Anderson, 477 U.S. at 256; Fed.
24  R. Civ. P. 56(a).

25

26

27

28

1    Where the non-moving party has the burden at trial,
2  however, the moving party need not produce evidence
3  negating or disproving every essential element of the
4  non-moving party's case.  Celotex, 477 U.S. at 325.
5  Instead, the moving party's burden is met by pointing out
6  that there is an absence of evidence supporting the
7  non-moving party's case.  Id.  The burden then shifts to
8  the non-moving party to show that there is a genuine
9  dispute of material fact that must be resolved at trial.
10  Fed. R. Civ. P. 56(a); Celotex, 477 U.S. at 324;
11  Anderson, 477 U.S. at 256.  The non-moving party must
12  make an affirmative showing on all matters placed in
13  issue by the motion as to which it has the burden of
14  proof at trial.  Celotex, 477 U.S. at 322; Anderson, 477
15  U.S. at 252.  See also William W. Schwarzer, A. Wallace
16  Tashima & James M. Wagstaffe, Federal Civil Procedure
17  Before Trial § 14:144.

18

19    A genuine issue of material fact will exist "if the
20  evidence is such that a reasonable jury could return a
21  verdict for the non-moving party."  Anderson, 477 U.S. at
22  248.  In ruling on a motion for summary judgment, a court
23  construes the evidence in the light most favorable to the
24  non-moving party.  Scott v. Harris, 550 U.S. 372, 378,
25  380 (2007); Barlow v. Ground, 943 F.2d 1132, 1135 (9th
26  Cir. 1991); T.W. Elec. Serv. Inc. v. Pac. Elec.
27  Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987).
28

### III. UNDISPUTED FACTS

The following facts are either undisputed by the parties, or the Court deems them undisputed for the reasons noted.

NPS is a private security company; its employees sometimes work as escorts for funeral processions, directing traffic as a traffic police officer would do. (Pl.'s SUF ¶¶ 1-3.)  On December 29, Juan Lopez was working for NPS as a security officer, and was assigned to lead a funeral procession from a mortuary in Temecula, California to a cemetery.  (Pl.'s SUF ¶¶ 4, 5, 13.) Other NPS security officers were also assigned to the funeral procession, and all of them, like Lopez, were riding black-and-white BMW retired police motorcycles equipped with air horns and flashing amber lights. (Pl.'s SUF ¶¶ 9-11.)  Lopez led the procession westbound on Sanborn Avenue to the intersection of Jefferson.  He stopped at the limit line of the intersection with his motorcycle's lights on and chirped the motorcycle's air horn several times.  (Pl.'s SUF ¶¶ 1-14.)  Traffic on Jefferson stopped; Lopez intended to secure the intersection to allow the funeral procession to turn southbound on Jefferson.

1    As Lopez began slowly riding his motorcycle towards
2  the middle of the intersection, the traffic signal facing
3  him on Sanborn was red.  (Pl.'s SUF ¶¶ 18-19.)  He
4  reached the middle of the intersection, dismounted, and
5  began directing traffic on foot.  (Pl.'s SUF ¶ 21.)
6  Between five and ten seconds later, he witnessed a
7  collision near the intersection.  (Pl.'s SUF ¶ 22.)
8  Lopez saw Ronald Phillips riding his motorcycle
9  northbound on Jefferson; the light in the intersection
10 facing the northbound Jefferson traffic was green, but
11 all traffic on Jefferson had stopped.  (Pl.'s SUF ¶ 24.)
12 Phillips braked but could not stop his motorcycle in time
13 to avoid a collision and skidded out of control.  (Pl.'s
14 SUF ¶ 25.)  Phillips was ejected from his motorcycle, hit
15 the Mitsubishi vehicle stopped in front of him on
16 Jefferson, and sustained fatal injuries.  (Pl.'s SUF
17 ¶ 26.)

18

19    No vehicles owned by NPS were involved in the
20 collision.  (Pl.'s SUF ¶ 27.)  Lopez was not cited for
21 any traffic violation, nor was NPS.  (Pl.'s SUF ¶ 29.)

22

23    Phillips's heirs filed suit in the California
24 Superior Court for the County of Riverside against Lopez,
25 NPS, and others, on July 30, 2010.  (Pl.'s SUF ¶ 31.)
26 Their complaint alleged claims for negligence (wrongful
27 death) and negligence per se.  (Pl.'s SUF ¶¶ 32-33.)

28

As of December 29, 2009, NPS was insured under a General and Professional Liability Policy, Policy No. 33053919, issued by Lexington ("the Lexington policy"). (Pl.'s SUF ¶ 34.)  The Lexington policy had an "each occurrence" limit of $1 million.  (Pl.'s SUF ¶ 35.) Section I — Coverages, contains the following provision:

> **COVERAGE A.  BODILY INJURY, PROPERTY DAMAGE AND PROFESSIONAL LIABILITY**
>
> **1.   Insuring Agreement.**
>
> **a.**   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "professional liability" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage" or "professional liability" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" or "wrongful act" and settle any claim or "suit" that may result.
>
> . . . .
>
> **b.**   This insurance applies to "bodily injury", "property damage" and "professional liability" only if:
>
> . . . .
>
> (2) The "bodily injury", "property damage" or "professional liability" occurs during the policy period.

(Ex. B to Stipulated Facts at 89-90.)

The Lexington policy includes the following definitions:

- "'Occurrence' means an accident, including continuous or repeated exposure to substantially the same generally harmful conditions." (Pl.'s SUF ¶ 37.)

- "'Bodily injury' means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." (Pl.'s SUF ¶ 38.)

- "'Professional liability' means liability legally imposed upon an insured arising out of a 'wrongful act.'" (Pl.'s SUF ¶ 39.)

- "'Wrongful act' means the actual or alleged negligent act, error or omission of an insured arising out of the insider's rendering or failure to render 'Professional Services.'" (Pl.'s SUF ¶ 40.)

- "'Professional services' means the rendering of security guard services pursuant to a written contract.  Security guard services shall include but not be limited to watchman, patrol and checkpoint services and related consulting services."  (Pl.'s SUF ¶ 41.)

1    The Lexington policy also includes, under a section

2    entitled "Exclusions," that the policy does not apply to:

3

4       **g.   Aircraft, Auto or Watercraft**

5       "Bodily injury", "property damage" or
        "professional liability" arising out of the

6       ownership, maintenance, use or entrustment to
        others of any aircraft, "auto" or watercraft

7       owned or operated by or rented or loaned to any
        insured.  Use includes operation and "loading or

8       unloading."

9       This exclusion applies even if the claims
        against any insured allege negligence or other

10      wrongdoing in the supervision, hiring,
        employment, training or monitoring of others by

11      that insured, if the "occurrence" or "wrongful
        act" which caused the "bodily injury", "property

12      damage" or "professional liability" involved the
        ownership, maintenance, use or entrustment to

13      others of any aircraft, "auto" or watercraft
        that is owned or operated by or rented or loaned

14      to any insured.

15   (Ex. B to Stipulated Facts at 93.)

16

17   On September 28, 2010, NPS tendered the Phillips suit

18   to Lexington.  (Pl.'s SUF ¶ 44.)  Lexington reviewed the

19   complaint and its policy, but did not conduct any

20   investigation.  (Pl.'s SUF ¶ 45.)  On October 1, 2010,

21   Lexington denied coverage.  (Pl.'s SUF ¶ 46.)

22

23   As of December 29, 2009, NPS was also insured under a

24   Commercial Auto Policy, Policy No. CAI0043227, issued by

25   Scottsdale ("the Scottsdale policy").  (Pl.'s SUF ¶ 47.)

26   The Scottsdale policy had a limit of $1 million for any

27

28

1   one accident or loss.  (Pl.'s SUF ¶¶ 48-49.)  Section II

2   — Coverage, contains the following provision:

3

4       **A.   Coverage**

5       We will pay all sums an "insured" legally must
        pay as damages because of "bodily injury" or

6   "property damage" to which this insurance applies, caused
    by an "accident" or use of a covered "auto".

7       . . . .

8

9       We have the right and duty to defend any
        "insured" against a "suit" asking for such
        damages or a "covered pollution cost or

10      expense."  However, we have no duty to defend
        any "insured" against a "suit" seeking damages

11      for "bodily injury" or "property damage" or a
        "covered pollution cost or expense" to which

12      this insurance does not apply. We may
        investigate and settle any claim or "suit" as we

13      consider appropriate. Our duty to defend or
        settle ends when the Liability Coverage Limit of

14      Insurance has been exhausted by payment of
        judgments or settlement.

15
    (Ex. A to Stipulated Facts at 12.)  The Scottsdale policy
16
    provides under the Coverage section that "insureds"
17
    consist of "You for any covered 'auto,'" and "Anyone else
18
    while using with your permission a covered 'auto' you
19
    own, hire or borrow."  (Pl.'s SUF ¶ 51.)
20

21
    On October 7, 2010, NPS tendered the Phillips suit to
22
    Scottsdale, which informed NPS on November 16, 2010, that
23
    it was appointing counsel to defend NPS in the suit.
24
    (Pl.'s SUF ¶¶ 52-53.)  In August 2011, Scottsdale settled
25
    the Phillips suit on behalf of NPS for $1 million.
26
    (Pl.'s SUF ¶ 57.)  Scottsdale paid for NPS's defense in
27
    the Phillips suit.  (Pl.'s SUF ¶ 59.)  On November 15,
28

2011 and December 20, 2011, Scottsdale sought reimbursement from Lexington, claiming that the Lexington policy covered the loss.  (Pl.'s SUF ¶ 58.)

## IV.  DISCUSSION

### A.  Equitable Subrogation

Equitable subrogation is "an insurer's right to be put in the position of the insured in order to pursue recovery from third parties legally responsible to the insured for a loss which the insurer has both insured and paid."  Garbell v. Conejo Hardwoods, Inc., 193 Cal. App. 4th 1563, 1571 (2011) (internal quotation marks omitted). Scottsdale settled the Phillips suit for $1 million and paid for the insured's defense in that action. Accordingly, Scottsdale may "stand in the shoes" of the insured and is subject to all of the insured's rights and liabilities.  See Employers Mut. Liab. Ins. Co. v. Tutor-Saliba Corp., 17 Cal. 4th 632, 639 (1998).

### 1.  Duty to Defend

Scottsdale's first claim alleges that Lexington breached its duty to defend the insured in the Phillips suit.  Here, however, Scottsdale did provide a defense. As an insured is entitled to only one full defense, "[a]n insurer's refusal to defend is of no consequence to an insured whose representation is provided by another insurer."  Safeco Ins. Co. v. Parks, 170 Cal. App. 4th

992, 1004 (2009) (internal quotation mark omitted).
Scottsdale cannot succeed as a matter of law on a
subrogated claim for breach of the duty to defend because
NPS could not bring such a claim in its own right.

Accordingly, the Court DENIES Scottsdale's Motion and
GRANTS Lexington's Cross-Motion as to this claim.

### 2.   Duty to Indemnify

Scottsdale's second claim alleges Lexington breached
its duty to indemnify NPS for the Phillips suit.  "The
insurer's duty to indemnify runs to claims that are
actually covered, in light of the facts proved.  By
definition, it entails the payment of money in order to
resolve liability.  It arises only after liability is
established." Buss v. Superior Court, 16 Cal. 4th 35, 45
(1997) (citations omitted).

As Scottsdale settled the Phillips suit on behalf of
NPS for $1 million, liability has been established.  In
order to succeed on its subrogated claim for breach of
duty to indemnify, Scottsdale must establish whether one
or both insurance policies covered the loss.  Scottsdale
asserts its own policy did not cover the loss, and the
Lexington policy did. (Pl.'s Mot. at 21.)  Lexington
contends that the inverse is true.  (Def.'s Opp'n at 1.)

14

### a. Coverage under the Scottsdale Policy

Scottsdale asserts Lopez was not "using" the auto as required for coverage under the Scottsdale policy, because he was not seated behind the motorcycle's steering controls at the time of the collision. (Pl.'s Mot. at 11.) Scottsdale bases its definition of use on the California Insurance Code, which states: "[t]he term 'use' when applied to a motor vehicle shall only mean operating, maintaining, loading, or unloading a motor vehicle," Cal. Ins. Code § 11580.06(g), and "[t]he term 'operated by' or 'when operating' shall be conclusively presumed to describe the conduct of the person sitting immediately behind the steering controls of the motor vehicle. The person shall be conclusively presumed to be the sole operator of the motor vehicle," id. § 11580.06(f).

Scottsdale's argument regarding "use" relates to the causation requirement (that is, whether the loss arose from the use of a covered auto), not to whether Lopez was an insured (that is, a permissive user) within the meaning of the Scottsdale policy. (See Pl.'s Mot. at 9 ("Under California law, the underlying accident did not arise out of the 'use' of any insured auto as required for coverage under the Scottsdale auto policy.").)

Courts routinely interpret the word "use" in automotive liability policies in accordance with California Insurance Code section 11580.06(f) and (g) when determining whether a person is a permissive user. See, e.g., Scottsdale Ins. Co. v. State Farm Mut. Auto. Ins. Co., 130 Cal. App. 4th 890, 897 (2005) (citing State Farm Mut. Auto. Ins. Co. v. Grisham, 122 Cal. App. 4th 563, 568 (2004); City of San Buenaventura v. Allianz Ins. Co., 9 Cal. App. 4th 402, 405 (1992); Nat'l Union Fire Ins. v. Showa Shipping Co., 47 F.3d 316, 321 (9th Cir. 1995)).

When dealing with the causation issue, however, courts tend to apply a broader definition of "use." See State Farm Fire & Cas. Co. v. Camara, 63 Cal. App. 3d 48, 54 (1976) ("The term [use] is not confined to motion on the highway, but extends to any activity in utilizing the insured vehicle in the manner intended or contemplated by the insured."); see also Prince v. United Nat'l Ins. Co., 142 Cal. App. 4th 233, 242 (2006) ("California courts take an expansive view of the term [use] and are disinclined to find overlapping coverage." (citing Allstate Ins. Co. v. Jones, 139 Cal. App. 3d 271, 278 (1983)). "Some minimal causal connection" between the use of the auto and the accident is required, State Farm Mut. Auto. Ins. Co. v. Partridge, 10 Cal. 3d 94, 100 (1973), however, and for the accident to arise out of the

16

use of the auto, the use must be a "predominating cause" or "substantial factor" in causing the injury, <u>State Farm Mut. Auto. Ins. Co. v. Grisham</u>, 122 Cal. App. 4th 563, 566 (2004).

Even under an expansive definition of the term "use," the loss in this case did not arise out of use of the covered auto.  Lexington makes much of the lights and horn on Lopez's motorcycle, but the accident occurred not because Lopez arrived at the scene on a motorcycle, rode the motorcycle into the intersection, or used the lights and horn on the motorcycle to gain drivers' attention, but because Lopez entered the intersection and attempted to stop traffic that had a green light.  The motorcycle was incidental to Lopez's attempt to secure the intersection.

This case is distinguishable from <u>Prince v. United Nat'l Ins. Co.</u>, 142 Cal. App. 4th 233 (2006), in which the court held that the death of two children whose foster mother had left them in an overheated car arose out of the use of the car.  <u>Id.</u> at 245.  The court in <u>Prince</u> emphasized that the insured's "negligence in leaving the children in the hot Vehicle 'simply cannot be dissociated from the use of the vehicle,'" <u>id.</u> (quoting <u>Nat'l Am. Ins. Co. v. Coburn</u>, 209 Cal. App. 3d 914, 920-21 (1989)), and noted that, "[h]ad she left them on a

park bench, in a grocery store, or on a neighbor's porch,
they would not have expired from hyperthermia," id.
Here, Lopez's alleged negligence in securing the
intersection is severable from his use of the motorcycle,
which was not a necessary factor in the accident.
Whether Lopez entered the intersection and attempted to
secure it on a motorcycle, on a skateboard, or on foot,
it was his attempt to stop traffic against the traffic
signals that allegedly caused the accident, and not his
mode of transportation.

To determine whether the accident could have occurred
without the use of Lopez's motorcycle, the Court need
only look to Essex Insurance Co. v. City of Bakersfield,
154 Cal. App. 4th 696 (2007).  In that case, the city was
holding a fundraiser near a highway, when a police
officer monitoring parking spotted a van merging onto an
'exit only' driveway and motioned it to remain on the
highway; the driver of a tractor-trailer behind the van
applied its brakes, jack-knifed, and collided with
another car.  Id. at 699-700.  The driver who was struck
filed a lawsuit against the city, alleging that, "[b]y
placing the heavily traveled [fundraiser] on a major
highway, and by providing dangerous and inadequate
traffic controls, signage, and traffic direction," the
city had proximately caused the plaintiff's injuries.
Id. at 701.

1    Here, Lopez allegedly created a dangerous condition
2  by stopping traffic that had a green light.  Although the
3  flashing lights, air horn, and transportation mechanisms
4  of the motorcycle may have assisted Lopez in securing the
5  intersection, that assistance did not rise to the level
6  of a predominating cause.  Accordingly, the loss did not
7  arise out of the use of a covered auto, and the
8  Scottsdale policy did not cover the loss.
9
10              **b.   Coverage under the Lexington Policy**
11    The Lexington policy was a general commercial
12  liability policy that covered all losses within the terms
13  of the insuring agreement unless those claims were
14  specifically excluded.  <u>See</u> <u>Westoil Terminals Co. v.</u>
15  <u>Indus. Indem. Co.</u>, 110 Cal. App. 4th 139, 146 (2003).
16  Lexington argues that the policy's provision excluding
17  coverage for losses "arising out of" the "use" of an
18  "auto" should apply to preclude coverage in this case.
19  (Def.'s Opp'n at 1.)  This exclusion mirrors the insuring
20  clause in the Scottsdale policy.  The Court has already
21  determined that the loss did not arise out of the use of
22  an auto.  Thus, for the same reasons that the Scottsdale
23  policy did not cover the loss, the Lexington policy did.
24
25    At the hearing, Lexington beseeched the Court to look
26  to the philosophical underpinnings of the insurance
27  policies, arguing that the loss in this case is the type
28

1  of risk that was contemplated in the automobile liability
2  policy, not in the professional liability policy.  This
3  argument is unconvincing.
4
5      To the extent Lopez used the motorcycle at all, he
6  used it to stop traffic, which was his goal.  Stopping
7  traffic is not at all the sort of use that drivers are
8  expected to make of an automobile.  In order for the
9  Scottsdale policy to contemplate that Lopez would use a
10  covered auto to stop traffic, the policy would have had
11  to take into account his professional duties, which
12  included accompanying funeral processions and, thus,
13  securing an intersection such that a funeral procession
14  could proceed.  The type of policy which, by its nature,
15  is expected to take into account an insured's
16  professional duties is a <u>professional liability insurance</u>
17  <u>policy</u>.  NPS's professional liability coverage came from
18  the Lexington policy, not the Scottsdale policy, and it
19  was the Lexington policy that should have contemplated
20  risk of the very loss that occurred in this case.
21
22      Lopez's alleged negligence in securing the
23  intersection for the funeral procession was a
24  professional liability risk, not an automobile liability
25  risk.  Accordingly, it is the Lexington policy that
26  provided coverage.
27
28

As established above, the Lexington policy provided sole coverage for the loss from the Phillips suit. Lexington thus has a duty to indemnify the insured for the amount of liability for the loss.  Accordingly, the Court GRANTS Scottsdale's Motion and DENIES Lexington's Cross-Motion as to this claim.

**B.   Equitable Indemnity**

Scottsdale's third claim asserts that it is entitled to equitable indemnity from Lexington for the settlement amount and cost of defending the Phillips suit. "Equitable indemnity 'applies in cases in which one party pays a debt for which another is primarily liable and which in equity and good conscience should have been paid by the latter party.'" <u>United Servs. Auto. Ass'n v. Alaska Ins. Co.</u>, 94 Cal. App. 4th 638, 644-45 (2001) (quoting <u>Phoenix Ins. Co. v. U.S. Fire Ins. Co.</u>, 189 Cal. App. 3d 1511, 1526 (1987)).

**1.   Indemnification of Settlement Amount**

As set forth above, the Lexington policy covered the loss and the Scottsdale policy did not.  Scottsdale, having paid a debt that Lexington should have paid, is entitled to indemnification from Lexington for the full amount of settlement.

**2.  Indemnification of Defense Costs**

Scottsdale and Lexington each had a duty to provide a complete defense to the insured.

Under California law, "a liability insurer owes a broad duty to defend its insured against claims that create a potential of indemnity." Horace Mann Ins. Co. v. Barbara B., 4 Cal. 4th 1076, 1081 (1993) (internal quotation marks and citations omitted); see also Gray v. Zurich Ins. Co., 65 Cal. 2d 263, 275 (1966) (holding that an insurer must defend any complaint that "potentially seeks damages within the coverage of the policy"). "Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded." Id.

> The defense duty is a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded or until it has been shown that there is no potential for coverage . . . . Imposition of an immediate duty to defend is necessary to afford the insured what it is entitled to: the full protection of a defense on its behalf.

Montrose Chem. Corp. v. Superior Court, 6 Cal. 4th 287, 295 (1993) (citations and internal quotation marks omitted).

The "determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the

policy." <u>Horace Mann</u>, 4 Cal. 4th at 1081; <u>see also La</u>
<u>Jolla Beach & Tennis Club Inc. v. Indus. Indem. Co.</u>, 9
Cal. 4th 27, 44 (1994).  The duty to defend is also
triggered if the insurer "becomes aware of . . . facts
giving rise to the potential for coverage under the
insuring agreement." <u>Waller v. Truck Ins. Exch., Inc.</u>,
11 Cal. 4th 1, 19 (1995).

An insurer's duty to defend depends on the "'facts
known by the insurer at the inception of a third party
lawsuit,'" not on "'the ultimate adjudication of coverage
under its policy of insurance.'" <u>Montrose</u>, 6 Cal. 4th at
295 (quoting <u>Saylin v. Cal. Ins. Guarantee Ass'n</u>, 179
Cal. App. 3d 256, 263 (1986)).  "Any doubt as to whether
the facts give rise to a duty to defend is resolved in
the insured's favor." <u>Horace Mann</u>, 4 Cal. 4th at 1081;
<u>see also</u> <u>Montrose</u>, 6 Cal. 4th at 300.  Nevertheless,
"where the extrinsic facts eliminate the potential for
coverage, the insurer may decline to defend even when the
bare allegations in the complaint suggest potential
liability." <u>Waller</u>, 11 Cal. 4th at 19.

### a. Lexington's Duty to Defend

NPS tendered the original complaint in the Phillips
suit to Lexington on September 28, 2010.  (Pl.'s SUF
¶ 44.)  The complaint alleged, inter alia, that the
insured was negligent in "the method and manner in which

[it] proceeded with a funeral procession." (Pl.'s SUF ¶ 32.)  This claim is vague enough to encompass a number of factual scenarios, including that which actually occurred, in which the loss did not arise from the use of an automobile, but from Lopez's actions in attempting to stop traffic that faced a green light.  In addition, as Lexington concedes that it did not undertake an independent factual investigation before denying coverage, it could not have acted on the basis of extrinsic facts that eliminated the potential for coverage.

The duty to defend is excused only when "the third party complaint <u>can by no conceivable theory raise a single issue which could bring it within the policy coverage</u>." <u>Montrose</u>, 6 Cal. 4th at 300 (quoting <u>Gray</u>, 65 Cal. 2d at 275 n.15).  As the complaint in the Phillips suit could have raised an issue covered by the Lexington policy (and did), Lexington had a duty to defend the Phillips suit.  Lexington breached its duty by denying coverage and refusing to provide a defense.

### b.  Scottsdale's Duty to Defend

Scottsdale also had a duty to defend the Phillips suit.  As stated above, the cause of action for negligence in "the method and manner in which [it] proceeded with a funeral procession" (Pl.'s SUF ¶ 32), is broad enough to encompass a factual scenario in which the

1  loss arose out of the use of an auto.  In addition, the

2  Phillips complaint included a negligence per se claim,

3  alleging that the insured "negligently, carelessly and

4  recklessly . . . failed to control, operate and drive

5  their vehicle so as to avoid plaintiff's husband/father

6  colliding with the vehicle resulting in severe and

7  serious injuries resulting in his death," and that Lopez

8  "violated Vehicle Code § 21453 by proceeding against a

9  red signal."  (Pl.'s SUF ¶ 33.)  These allegations could

10  encompass facts showing that the loss arose out of the

11  use of a covered auto.  As theories existed by which the

12  claims in the Phillips complaint could have been covered

13  by the Scottsdale policy, Scottsdale had a duty to defend

14  the suit.  <u>See</u> <u>Montrose</u>, 6 Cal. 4th at 300.

15

16              **c.   Defense Cost Apportionment**

17      Lexington asserts that, to the extent both policies

18  covered the loss, the Lexington policy was excess and

19  thus Scottsdale was responsible for the full amount of

20  the defense costs.  (Def.'s Opp'n at 16-19; Def.'s Cross-

21  Mot. at 15-16.)  Lexington's argument is rooted in two

22  bases.  First, the California Insurance Code provides:

23          where two or more policies affording valid and
            collectible liability insurance apply to the
24          same motor vehicle or vehicles in an occurrence
            out of which a liability loss shall arise, it
25          shall be conclusively presumed that the
            insurance afforded by that policy in which the
26          motor vehicle is described or rated as an owned
            automobile shall be primary and the insurance
27          afforded by any other policy or policies shall
            be excess.

28

                              25

Cal. Ins. Code § 11580.9(d).  Lexington argues that this provision applies to make the Lexington policy excess because the Scottsdale policy describes the motorcycle Lopez was driving.  (<u>See</u> Def.'s Opp'n at 16-17).

Section 11580.9(d) does not apply, because this is not a case in which two policies applied to the same "motor vehicle."  Only the Scottsdale policy applied to the motorcycle.  The Lexington policy expressly excluded coverage for any loss arising out of the use of an auto; as such, that policy could not have applied to Lopez's motorcycle.

Second, Lexington bases its argument on the "other insurance" clause in the Lexington policy, which provides that "[t]his insurance is excess over . . . any of the other insurance . . . [i]f the loss arises out of the maintenance or use of" an auto "to the extent not subject to" the auto exclusion.  (Def.'s Opp'n at 18-19; Def.'s Cross-Mot. at 17-18; Ex. B to Stipulated Facts at 106.)

This clause in the Lexington policy likewise does not apply.  The Court has already found that the loss did not arise out of the use of an auto.  Moreover, Lexington's duty to defend existed because of the potential that the insured would be found liable for a loss that did <u>not</u>

arise out of the use of an auto.  The policies did not
cover the same loss, so neither could be excess.

"[T]he trial court's determination of which method of
allocation will produce the most equitable results is
necessarily a matter of its equitable judicial
discretion."  See Scottsdale Ins. Co. v. Century Sur.
Co., 182 Cal. App. 4th 1023, 1032 (2010).  As both
Scottsdale and Lexington were responsible for providing a
complete defense to the Phillips suit, equity requires
that the parties share equally in the defense costs.

Accordingly, the Court GRANTS Scottsdale's Motion and
DENIES Lexington's Cross-Motion as to this claim, and
awards Scottsdale $1 million and one-half of the cost of
defending the Phillips suit.

## C.  Remaining Issues

As the parties' respective liability has been
established through the substantive claims, Scottsdale's
claim for declaratory relief is DENIED as moot.

Lexington's Cross-Motion for Summary Judgment is a
mirror image of Scottsdale's Motion.  Thus, to the extent
not granted, Lexington's Cross-Motion is DENIED as moot.

**V.   CONCLUSION**

As set forth above, the Court GRANTS Scottsdale's
Motion as to Scottsdale's second claim asserting breach
of duty to indemnify and third claim for equitable
indemnification; and DENIES Scottsdale's Motion as to
Scottsdale's first claim asserting breach of duty to
defend and fourth claim requesting declaratory relief.
The Court also GRANTS Lexington's Cross-Motion as to
Scottsdale's first claim asserting breach of duty to
defend; Lexington's Motion is otherwise DENIED.
Scottsdale is awarded $1 million and one-half of the cost
of defending the Phillips suit.

Dated:  December 18, 2012

VIRGINIA A. PHILLIPS
United States District Judge